# EXHIBIT A

*Filed and Attested by PROTHONOTARY 28 Sep 2021 03:24 PM M. BARR*

IN THE COURT OF COMMON PLEAS OF CHESTER COUNTY, PENNSYLV
CIVIL ACTION

| | |
|---|---|
| MICHAEL GERAGHTY | : No. 2021-05552-CT |
| 500 West Rosedale Avenue | : |
| Apt. CLB10 | : |
| West Chester, PA  19382 | : |
| *Plaintiff* | : |
| | : |
| v. | : |
| | : |
| EAST BRADFORD TOWNSHIP, | : |
| CHESTER COUNTY | : |
| 666 Copeland School Road | : |
| West Chester, PA 19380 | : |
| and | : |
| AMANDA CANTLIN, Individually and on behalf | : |
| of EAST BRADFORD TOWNSHIP | : |
| c/o 666 Copeland School Road | : |
| West Chester, PA 19380 | : |
| and | : |
| JOHN CARROLL | : |
| 1136 West Chester Road | : |
| S. Coatesville, PA  19320 | : |

## NOTICE TO DEFEND

You have been sued in Court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THESE PAPERS TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service
Chester County Bar Association
15 West Gay Street
West Chester, PA  19381
(610) 429-1500

CURTIN & HEEFNER LLP
By:    Robert D. Sokolove, Esquire               Attorney for Plaintiff
Attorney I.D. #26859                             Michael Geraghty
1040 Stony Hill Road, Suite 150
Yardley, PA 19067
Phone:  (215) 736-2521
Fax:  (215) 736-3647
Email:  rs@curtinheefner.com

---

IN THE COURT OF COMMON PLEAS OF CHESTER COUNTY, PENNSYLVANIA
CIVIL ACTION

| | |
|---|---|
| MICHAEL GERAGHTY | : No.  2021-05552-CT |
| 500 West Rosedale Avenue | : |
| Apt. CLB10 | : |
| West Chester, PA  19382 | : |
| *Plaintiff* | : |
| | : |
| v. | : |
| | : |
| EAST BRADFORD TOWNSHIP, | : |
| CHESTER COUNTY | : |
| 666 Copeland School Road | : |
| West Chester, PA 19380 | : |
| and | : |
| AMANDA CANTLIN, Individually and on behalf | : |
| of EAST BRADFORD TOWNSHIP | : |
| c/o 666 Copeland School Road | : |
| West Chester, PA 19380 | : |
| and | : |
| JOHN CARROLL | : |
| 1136 West Chester Road | : |
| S. Coatesville, PA  19320 | : TRIAL BY JURY DEMANDED |

## **COMPLAINT**

1.      Plaintiff, Michael Geraghty, is an adult resident who at all times relevant herein, resided in West Chester, Pennsylvania.

2.      Defendant, Township of East Bradford, is a municipal organization pursuant to the laws of the Commonwealth of Pennsylvania, and maintains its municipal address within Chester County, Pennsylvania.

3.     Defendant, Amanda Cantlin, at all relevant times herein, served, and upon information and belief, continues to serve as the Township Manager for Defendant, East Bradford Township.

4.     Defendant, John Carroll was at all relevant times herein, the Township of East Bradford's Director of Public Works.

5.     At all relevant times herein, Plaintiff was employed within the Department of Public Works, East Bradford Township.  His tasks included, among other things, maintaining, repairing, and otherwise undertaking various activities, as directed by his supervisor, performing work on behalf of Defendant Township with respect to its publicly owned properties.

6.     Plaintiff's day-to-day duties included, among other things, and as relevant to this case, inspection and removal of decayed, dangerous, and/or downed trees which could or, in fact, fell down within the highways and rights-of-way of the Defendant, East Bradford Township.

7.     Although Plaintiff and others working for the Public Works Department, under the direction of Defendant, John Carroll, would reasonably see, observe, and otherwise be in a position to place the Defendant Township on notice of decaying or dangerous tree limbs with the Township, it was Township policy, specifically per the Director of Public Works, for Plaintiff and other similarly situated employees to neither "see" or report on dangerous conditions involving trees within the Township.

8.     To wit, Defendant Carroll, on behalf of Defendant Township, on numerous occasions throughout the tenure of Plaintiff's employment with the Township, specifically instructed Plaintiff and others working in the Public Works Department, to "put blinders on" with respect to dangerous trees which they observed while driving throughout the highways owned by Defendant Township.

9.     Upon information and belief, Defendant Carroll, who worked directly under the authority of Defendant Cantlin, the Township Manager, was given full Township authority to produce and enforce policies, procedures, directions, and in all material respects undertake those public policies and procedures necessary to effectively operate the Public Works Department of the Township of East Bradford.

10.     Again, upon information and belief, Defendant Carroll regularly interfaced with, communicated with, and otherwise shared his approaches, directives, policies, and procedures which he mandated within the Public Works Department for review and full approval from Defendant Cantlin.  These provisions included not only how the Department was to operate, but also involved other issues including matters of human resources, budgetary issues, and all other relevant policies and procedures which would reasonably be expected of an independent director of public works operating under the full auspices of the Authority of the Defendant Township.

11.     One Township policy and procedure was specifically for individuals working in the Public Works Department, including the Plaintiff, to explicitly ignore dangerous conditions involving decayed or dead trees unless and until those trees actually fell onto a public right-of-way.

12.     On or about May, 2016, Plaintiff was working on a "road crew" that was authorized to remove a fallen limb which was partially blocking an East Bradford Township road.

13.     During this period of time in Plaintiff's life, he was co-habitating with Ms. Melanie Harlan, whose tree company, Harlan Tree Services, Inc., served as the on-call tree services company for the Defendant.

14.     On many instances, Plaintiff interfaced professionally with Melanie Harlan and members of her staff with respect to the removal and inspection of downed trees in the Township.

15.     On or about May, 2016, Plaintiff, while on a downed tree event in East Bradford Township, and in the presence of Melanie Harlan and Plaintiff's direct Supervisor, Defendant John Carroll, Plaintiff and John Carroll were informed by Melanie Harlan that a couple of trees slightly down the street from the one they were attending to, were decayed and a potential risk for their large limbs falling onto the roadway below.

16.     Harlan was prepared, while in the general vicinity, to remove those decayed tree limbs, but was instructed by Defendant Carroll not to.

17.     Despite being put on actual notice by Harlan of the imminent danger of the tree limbs nearby, Defendant Carroll concluded to do nothing and allow the limbs to remain in place.

18.     Thereafter, on or about December 25, 2016, an individual named Eric Blevins was driving his truck along the same stretch of roadway and the tree limbs, which were decayed as pointed out to Defendant Carroll, came crashing down onto the Blevins vehicle seriously injuring Mr. Blevins.

19.     Plaintiff immediately became aware that these were the same tree limbs that Harlan, his then live-in girlfriend, had pointed out to Defendant John Carroll as requiring removal so as to avoid the very incident that, in fact, occurred.

20.     Defendant Carroll, immediately thereafter, set out to undertake a strategy on behalf of the Township to "defend" any potential liability resulting from his failure to abide by the recommendations made by Harlan regarding removal of the tree.

21.     Defendant Carroll, for example, initially informed Township officials, investigators, and others looking into the matter as a result of the Blevins lawsuit, that the Township had "no notice" of the decayed tree limbs which injured Blevins.  He denied the explicit

verbal conversation with Harlow regarding the need to remove the dangerous tree that Harlan noticed when working on the nearby tree removal.

22.     Defendant Carroll and the Defendant Township then proceeded to defend the lawsuit from Blevins along the highly outrageous basis that they had no prior notice or knowledge of the tree situation, that Harlan had never provided any such information regarding the dangerous tree situation, and even decided to third-party Harlan's company as a Defendant in the lawsuit, presumably on the theory that she and her company failed to disclose a dangerous condition to the Township.

23.     Despite having brought the legal action against Harlan Tree Company, as a third-party defendant, the Township never prosecuted its claim against her company, but kept her and her company "involved" in the lawsuit virtually up to the time of trial.

24.     Defendant Carroll knew that this situation put Plaintiff in a very difficult position. That is, on one hand, Plaintiff knew of the representations made by his girlfriend, Harlan, to Defendant Carroll regarding notice of the dangerous tree.  Yet, Defendant Carroll insisted that no such discussion ever took place, knowing full well that Plaintiff was not only present during the discussions, but was regularly discussing the matter with his girlfriend, Melanie Harlan.

25.     Additionally, Defendant Carroll understood the difficult position this put Plaintiff into, to wit, on one hand he had personal loyalties to his girlfriend, Melanie Harlan, but worked for Defendant John Carroll, head of the Public Works Department.

26.     Throughout the pendency of the investigation of the tree incident and subsequent litigation involving Blevins, Defendant Carroll, on behalf of the Township, continued a virtual non-stop campaign of pressuring, abusing, inappropriately coaxing, and generally demanding that Plaintiff, "know nothing" about the prior notice relating to the defective tree limb.  Defendant

Carroll, on behalf of Defendant Township, demanded that Plaintiff forfeit his First Amendment Right to notate and honestly petition a matter of public interest and instead "remember" nothing of the notice given to the Township regarding a highly dangerous condition.  Plaintiff's failure and ultimate refusal to accede to Defendant Carroll's and the Defendant Township's desire to stretch the truth on a matter of important public interest formed the basis of, and the motivating factor in creating a hostile work environment so severe for Plaintiff that he was forced to involuntarily terminate his employment for, primarily, his emotion and physical health.

27.   Specifically, among other things, when discussing the service of process of the third-party claim against Harlan with Plaintiff, Defendant Carroll told Plaintiff that he (Plaintiff) could tell Harlan that she could "wipe her ass" with the suit papers as far as he was concerned.

28.   On multiple occasions throughout the pendency of the litigation, Defendant Carroll would inquire in an aggressive manner of Plaintiff the nature of the discussions he was having with Harlan regarding the incident, what kind of things she was prepared to say regarding him (Defendant Carroll) and the incident, was attempting to coerce Plaintiff into "forgetting" what actually was said and had occurred, and in all material respects, was expecting Plaintiff to be dishonest if and when it was time for the Plaintiff to testify in the matter involving the Blevins case.

29.   This regular course of abusive and coercive communication from Defendant Carroll to Plaintiff continued through and after Plaintiff's deposition in the Blevins matter.  While Plaintiff attempted to walk a "fine line" at his deposition between speaking truthfully, thus supporting the Harlan position, he also was living in literal fear of the ramifications from Defendant Carroll if and when he testified truthfully at his deposition.

30.     Leading up to the deposition, Defendant Carroll regularly called Plaintiff, sometimes late into the evening, attempting to shape his testimony to be consistent with his (Carroll's) improper and dishonest positions, and on multiple occasions, threatened Plaintiff with testifying "correctly."

31.     As soon as the deposition of Plaintiff in the Blevins case ended, Defendant Carroll curtly called Plaintiff into his office and said "from this point forward, you and I are strictly business."

32.     Having an actual, reasonable, and likely fear of retribution from Defendant Carroll, Plaintiff immediately went to Defendant Cantlin's office and literally begged her not to share the contents of his deposition testimony with Defendant Carroll if, and presumably when, Defendant Cantlin received a copy of the deposition transcript, and/or understood the substance of Plaintiff's testimony.

33.     Defendant Cantlin ignored the request by Plaintiff.  Instead, according to Defendant Carroll, he and Defendant Cantlin specifically discussed Plaintiff's testimony contrary to the strong request by Plaintiff not to do so.

34.     Defendant Cantlin knew, or should have known, of the desperate and impossible situation, she, Defendant Carroll, and the Township were placing Plaintiff into given his relationship with Harlan, his own personal observations of events leading up to the Blevins lawsuit, and the demands which were being placed upon Plaintiff to "play ball" with the Township's position in the litigation.

35.     Combined with the Township's prior admonitions to Plaintiff and others in the Public Works Department to "put blinders on" with respect to observing dangerous trees throughout the Township, the Township created a clear and unequivocal policy of, on one hand,

creating a dangerous condition to the public, while at the same time demanding its employees be silent and not exercise sound judgment or even their First Amendment Rights regarding an issue of public policy and interest.

36.     This approach was designed to, intended to, and had the actual effect of creating an atmosphere within the Department of Public Works and the Township as a whole, of intimidation to its employees when they, including the Plaintiff, otherwise should have been encouraged to speak the truth and be able to raise legitimate safety concerns.

37.     From the inception of the original downed tree incident, which brought Harlan to the general location of the downed tree which hit Blevins, through the litigation involving the Blevins matter, and even after the case settled, Plaintiff was regularly chastised, abused, ridiculed, and in all respects placed in an untenable position by the actions and non-actions of Defendant Carroll, Defendant Cantlin, and the Defendant Township from whom they were carrying out this approach of addressing dangerous conditions within the Township.

38.     Plaintiff's employment situation within the Township became more untenable with each passing day.  The verbal abuse and admonitions from Defendant Carroll on behalf of the Township, became worse by the day.  Plaintiff's standing and job advancement were diminished as a result of Plaintiff's involvement in the Blevins matter, and in all material respects, the work environment directly involving Plaintiff became hostile, at best, and more precisely abusive.  To be clear, Plaintiff's exercise of his First Amendment Right to testify honestly became the very basis and motivation for Defendant Carroll and the Defendant Township to retaliate against Plaintiff.  Defendant Cantlin allowed this retaliation to occur, having learned directly from Plaintiff the negative affects this was having on his work environment and his emotional well-being.

39.     In the midst of the Blevins matter, given the stress and abuse Plaintiff was being subjected to, he began to seek emotional and psychological counseling in an attempt to address the negative impacts he was suffering as a result of the hostile work environment.  Plaintiff continues to suffer today from the inappropriate pressure and aggressive, divisive , and inappropriate direction he was receiving from the Defendant Township while employed.

40.     As a direct and proximate result of the outrageous actions of the Defendant Township, Defendant Carroll, and Defendant Cantlin, Plaintiff was taken to a breaking point which required his separation from the Township.  As such, Plaintiff was constructively terminated from his position with the Township.

41.     As a result of Plaintiff's constructive termination, he has suffered the loss of income, benefits, and most particularly a loss of life's functions as a result of the emotional distress he suffered and continues to suffer as a result of the events described herein.

42.     The resulting stress has caused a break-up of his long-term relationship with Harlan, has produced both physical manifestations to the Plaintiff as well as severe emotional distress, all as a result of the abusive and hostile work environment produced by Defendants, Township of East Bradford, Carroll and Cantlin.

## CAUSES OF ACTION

## COUNT I - CONSTRUCTIVE TERMINATION

43.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 42 as if fully set forth herein.

44.     During Plaintiff's tenure as an employee in the Public Works Department of East Bradford Township, he was regularly and continually directed by the Defendant Carroll, working

on behalf of the Defendant Township, and under the direction of Defendant Cantlin, to intentionally ignore and not address dangerous conditions placing the public at risk.

45.   These directions and demands by his supervisor, Defendant Carroll, on behalf of the Defendant Township, became more pronounced and more directed following the accident involving Eric Blevins.  In this instance, Plaintiff was specifically admonished by Defendant Carroll, on behalf of the Defendant Township, to "be sure he really remembered" what he saw prior to the Blevins incident; that is, the message to Plaintiff from Defendant Carroll was to "forget" what he heard and observed which was potentially prejudicial to the Township's financial interests.

46.   Prior to the Blevins incident, Plaintiff was regularly instructed by Defendant Carroll, on behalf of the Defendant Township, as a matter of municipality policy to "put on blinders" when driving around the Township and potentially observing dangerous conditions such as trees which could likely fall and harm the public at large.  This was a directive given, at least, to all employees working at the time in the Public Works Department.

47.   Then, at the time of the Plaintiff's deposition in the Blevins case, Defendant Carroll, on behalf of the Defendant Township, was regularly calling the Plaintiff, at his home, including non-working, late hours, making certain demands of him, essentially demanding that he craft his testimony in a way that would not be  consistent with the facts, and said abusive behavior by Defendant Carroll continued after the Plaintiff's deposition in the Blevins case.

48.   Even after the deposition, Defendant Carroll, individually and on behalf of the Defendant Township, continued to badger Plaintiff, demanded to know how he testified, and met with Defendant Cantlin to learn the specifics of the Plaintiff's deposition testimony when the

deposition transcript and/or information from the Township attorneys was received by Defendant Cantlin for her review.

49.     Despite Plaintiff's specific request of Defendant Cantlin that she not share the specifics of Plaintiff's deposition testimony with Plaintiff's direct supervisor, Defendant Carroll, Defendant Cantlin did, in fact, discuss the substance of his testimony with Defendant Carroll. Thereafter, Defendant Carroll was unmerciful in his treatment of Plaintiff, was consistently abusive in his interactions with Plaintiff, limited his supervisory work opportunities, and in all general respects, made Plaintiff's work life as uncomfortable and difficult as possible for Plaintiff.

50.     Defendant Carroll's actions, as described above, while acting individually and on behalf of the Defendant Township, were clear examples of retribution and retaliation for Plaintiff's testimony at his deposition in the Blevins matter.

51.     As the actions of Defendant Carroll and the Defendant Township, as ultimately authorized by Defendant Cantlin, continued to worsen, Plaintiff was forced to leave his position with the Township, and in so doing, lost the opportunities of salary, pension, insurance and other benefits he otherwise would have maintained, were he not constructively discharged from his position.

WHEREFORE, as a result of the actions of all Defendants in constructively discharging Plaintiff from his position, Plaintiff demands judgment and damages, including, but not limited to, his front and back pay, his loss of benefits, damages relating to his physical and mental/emotional distress resulting therefrom, attorney's fees, and punitive damages against Defendants Cantlin and Carroll.

## COUNT II - HOSTILE WORK ENVIRONMENT

52.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 51 as if fully set forth herein.

53.     As noted in the paragraphs above, Defendants Carroll and Cantlin individually and on behalf of the Defendant Township, and the Township itself produced a work environment for Plaintiff that was abusive, demeaning, outrageous, and intentionally designed to produce an atmosphere in and around Plaintiff by which Plaintiff could not physically or emotionally manage to remain in his position as an employee with the Township.

54.     More specifically, and in addition to the allegations above, Plaintiff was required to respond to Defendant Carroll's constant badgering and demands with respect to Plaintiff's knowledge, information and intentions as they related to his likely testimony in the Blevins matter. Even after the Blevins case, Plaintiff was subjected to constant, abusive treatment from Defendant Carroll and the Township with respect to his involvement and information regarding the Blevins matter.

55.     Defendant Cantlin knew of the environment produced in and around Plaintiff with respect to the Blevins case insofar as Plaintiff specifically reached out to Defendant Cantlin and requested her assistance with respect to the abusive work environment being produced by Defendant Carroll on behalf of the Public Works Department.

56.     Notwithstanding Plaintiff's specific discussions with Defendant Cantlin, she, individually and on behalf of the Defendant Township, did nothing to alter, change or improve the work environment surrounding Plaintiff which became hostile to the point of him having to leave his employment, given the mental stress these activities were producing.

57. Moreover, Defendant Cantlin, as Township Manager, was responsible for managing a Public Works Department in which the culture, atmosphere, and policies within the organization demanded employees to maintain a "put blinders on" approach with respect to known public risk.

58. Plaintiff was unable and unwilling to continue his employment under these abusive and dangerous circumstances and was forced to separate from his employment under these hostile work conditions.

WHEREFORE, as a result of the actions of all Defendants in constructively discharging Plaintiff from his position, Plaintiff demands judgment and damages, including, but not limited to, his front and back pay, his loss of benefits, damages relating to his physical and mental/emotional distress resulting therefrom, attorney's fees, and punitive damages against Defendants Cantlin and Carroll.

## COUNT III - RETALIATION/VIOLATION OF FIRST AMENDMENT RIGHTS

59. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 58 as if fully set forth herein.

60. Plaintiff's position within the Department of Public Works ultimately demanded that he participate in a deposition, under oath, involving the Blevins matter.

61. It was well known to Defendant Carroll individually and Defendant Carroll acting under the color of law on behalf of the Defendant Township, that Plaintiff was aware of critical information in the Blevins case which could potentially be harmful to the positions taken by Defendant Carroll individually, and the Defendant Township with respect to their alleged defenses in the Blevins case.

62.     Knowing full well the information known by Plaintiff and his relationship with Melanie Harlan, who also had information potentially harmful to the Defendant Township, Defendant Carroll, individually and on behalf of the Defendant Township, undertook a concerted pattern of abusive behavior designed to stifle, silence, intimidate, and otherwise direct Plaintiff's testimony in a manner which can only reasonably be construed as contrary to the facts known by Plaintiff.

63.     Defendant Carroll's abusive and retaliatory actions included, but were not limited to, job actions in which Plaintiff's authority was diminished, outlandish interaction and threats made regarding Plaintiff's girlfriend, Melanie Harlan, and other and various forms of ridicule, threats, and activities which were designed to intimidate Plaintiff from exercising his First Amendment Right and speaking truthfully regarding his knowledge regarding the Blevins incident.

64.     Ultimately, because Plaintiff exercised his First Amendment Rights by testifying about specific knowledge he had of the Blevins incident at his deposition, Defendant Carroll, operating under the direction and support of Defendant Cantlin, and on behalf of the Defendant Township, retaliated against Plaintiff in various ways, including, but not limited to, abusive behavior, various threats, diminishing Plaintiff's position within the Department where he was employed, and generally undertaking abusive behavior such as after-hour calls to Plaintiff regarding his testimony.

65.     These retaliatory activities and the abuse leading up to Plaintiff's deposition testimony were a pattern and practice of Defendant Carroll individually while operating on behalf of the Defendant Township in an attempt to coerce Plaintiff, diminish his First Amendment Rights, speak truthfully about known public risks, and to attempt to direct his testimony in a more favorable manner towards the Defendant Township.

66.     These blatant attempts at violating Plaintiff's First Amendment Rights, his right to appropriately petition when observing wrongdoing, and the ultimate retaliation by the Defendants, impacted Plaintiff greatly emotionally, physically and ultimately financially as Plaintiff was required to depart from his employment.  Moreover, the exercise of Plaintiff's First Amendment Right to speak freely regarding a matter of important public interest and safety became the primary motivating factor and the basis for retaliation against Plaintiff, individually and collectively by all three Defendants in this matter.

WHEREFORE, as a result of the actions of all Defendants in retaliating against Plaintiff for exercising his First Amendment Rights and constructively discharging Plaintiff from his position, Plaintiff demands judgment and damages, including, but not limited to, his front and back pay, his loss of benefits, damages relating to his physical and mental/emotional distress resulting therefrom, attorney's fees, and punitive damages against Defendants Cantlin and Carroll.

## COUNT IV - VIOLATION OF 42 U.S.C. 1983

67.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

68.     The aforesaid actions of Defendants Carroll and Cantlin were not independent, random actions.  Rather, the pattern, practice and policy of the Department of Public Works for East Bradford Township included, among other things, a spoken directive to employees, including Plaintiff, to intentionally ignore dangerous conditions which could negatively affect the public with the express understanding that retaliatory activities would likely follow if "blinders were not put on" by Plaintiff and other similarly situated employees.

69.     When Plaintiff was inclined to exercise his First Amendment Rights, to appropriately petition when he observed dangerous improprieties within the Department, and

ultimately when faced when having to testify under oath, Plaintiff's employment was constructively terminated in retaliation for Plaintiff having exercised his First Amendment Rights.

70.     Additionally, Defendants Cantlin and Carroll, individually, but while operating under the color of state law, coerced Plaintiff (Carroll) and allowed this coercion to continue (Cantlin) before and after Plaintiff testified in the deposition at the Blevins proceeding.

71.     More specifically, Defendant Carroll, acting under the color of state law, undertook a pattern and practice of first suggesting to his subordinate, the Plaintiff, that he "remember" facts in the Blevins matter inconsistent with what Plaintiff believed to be the truth while Defendant Cantlin failed to protect Plaintiff's interest after she became aware that Plaintiff was attempting to testify honestly and openly at the subject deposition.

72.     In the final analysis, Defendant Cantlin failed to protect Plaintiff's financial, physical and emotional interests following the deposition, effectively endorsed the activity of Defendant Carroll, refused to intervene in protecting Plaintiff from the retribution and retaliation he was suffering as a result of his exercising his First Amendment Rights, and generally supported the positions that Defendant Carroll took in the Blevins litigation knowing full well that they were inconsistent with the observations and truthful testimony and protests being offered by Plaintiff. Defendant Cantlin never took any reasonable action to reconcile Plaintiff's truthful testimony with the dishonest positions being taken by Defendant Carroll and the Defendant Township in the Blevins matter.  This policy and approach undertaken by Manager Cantlin was known by her to be dishonest, and was a direct admonition of Plaintiff,  and itself a retaliatory act, which led to Plaintiff's job separation from the Township.

73.     Defendant Carroll, acting on behalf of the Defendant Township, undertook abusive, retaliatory actions against Plaintiff for exercising his First Amendment Rights, while, at all times,

acting on behalf of the Defendant Township, under the authority of Defendant Cantlin, and under the color of state law.

74.     Taken as a whole, these policies, practices, procedures, and directives, made by Defendants Carroll and Cantlin had the effect of, and expectedly produced a culture within the Public Works Department which demanded dishonesty from its employees, or otherwise risk the type of hostile work environment and abusive retaliation such as that which was suffered by Plaintiff while in the employment of the Defendant Township.

75.     The above constitutes a violation of 42 U.S.C. §1983 insofar as it abridges Plaintiff's First Amendment Rights and retaliates against Plaintiff for exercising those rights while under the employment of the Defendant Township.

WHEREFORE, as a result of the actions of all Defendants in depriving Plaintiff of his First Amendment Rights and his right to petition on a matter of critical public interest, Plaintiff demands judgment and damages, including, but not limited to, his front and back pay, his loss of benefits, damages relating to his physical and mental/emotional distress resulting therefrom, attorney's fees, and punitive damages against Defendants Cantlin and Carroll.

## COUNT V - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (DEFENDANT JOHN CARROLL)

76.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 75 as if fully set forth herein.

77.     Defendant John Carroll was well aware that the Plaintiff, while in his employment, lived with Melanie Harlan, whose company was an on-call contractor specializing in the removal of trees, on behalf of the Defendant Township.

78.     Defendant Carroll was also aware of the knowledge Plaintiff had with respect to the decayed trees which formed the basis of the Blevins claim against the Township, which was the subject matter of Plaintiff's deposition testimony as described above.

79.     In a blatant attempt to coerce false testimony by the Plaintiff in the Blevins matter, Defendant Carroll dishonestly informed other Township officials that he was never given any notice, prior to the Blevins incident, of the decayed trees which were the subject matter of that lawsuit.

80.     In providing false information and testimony regarding these facts, Defendant Carroll also knew full well that his position with respect the decayed trees was in direct conflict with the information known by Plaintiff's girlfriend, Melanie Harlan, who personally had seen the decayed trees prior to the Blevins incident and reported this condition to Defendant Carroll, himself.

81.     Notwithstanding this situation, Defendant Carroll went out of his way to place his subordinate, the Plaintiff, in a highly uncomfortable position pitting Plaintiff against his girlfriend so as to protect and support his dishonesty with respect to the facts in the Blevins case.

82.     Specifically, Defendant Carroll supported an action by the Township to bring Harlan Tree Company into the case as a third party defendant, knowing full well that Harlan Tree Company had absolutely nothing to do with, and shared no liability whatsoever with respect to the Blevins tree incident.

83.     In support of this proposition, and knowing that bringing Harlan into the case would severely compromise Plaintiff's loyalty and manifest severe emotional strain upon him, Defendant Carroll specifically informed Plaintiff to tell then third-party defendant, Harlan, Plaintiff's girlfriend, that she could "wipe her ass" with the suit papers which had just been served upon her.

84.     Throughout the course of the Blevins litigation, Defendant Carroll took a multitude of other activities designed to stress, strain the relationship between Plaintiff and Harlan, and in all material respects, make Plaintiff's life miserable because Plaintiff was inclined to testify honestly in the Blevins case.

85.     Defendant Carroll's activities included, not only these types of inappropriate discussions and activities described above, including after hour threatening phone calls and the constant badgering of Plaintiff regarding his knowledge of the Blevins case, but other forms of intentional retaliation against Plaintiff after he testified in the Blevins matter.

86.     All of these activities were incredibly inappropriate, outrageous, dangerous and designed, directed and intended to force his subordinate to testify untruthfully before this Honorable Court.

87.     Defendant Carroll's activities were so outrageous and so contrary to the public's interest, safety, health, and well-being that they can only be characterized as attempting to inflict such serious emotional distress on Plaintiff such that he would be unable to truthfully and honestly testify on the public's behalf.

88.     As a result of Defendant Carroll's intentional and outrageous activities designed to produce emotional distress on the part of the Plaintiff, the Plaintiff did indeed suffer severe emotional distress manifested by physical ailments, serious enough that they required Plaintiff to seek the care and treatment of a psychologist to assist him with his emotional distress.

89.     These activities are so blatant and contrary to public policy as to amount to an intentional infliction of emotional distress by Defendant Carroll for which he should be responsible for the damages suffered by Plaintiff.

WHEREFORE, Plaintiff demands damages in excess of $50,000.00 for the emotional distress caused by Defendant Carroll and seeks punitive damages from Defendant Carroll for the intentional injuries he caused Plaintiff to suffer therefrom.

TRIAL BY JURY IS DEMANDED.

CURTIN & HEEFNER LLP

By:_____
Robert D. Sokolove, Esquire
Attorney for Plaintiff

## VERIFICATION

Plaintiff, Michael Geraghty, hereby verifies that he is the Plaintiff herein; that he is acquainted with the facts set forth in the forgoing Complaint; that the same are true and correct to the best of his knowledge, information and belief; and that this statement is made subject to the penalties of 18 Pa.C.S. §4904 relating to unsworn falsifications to authorities.

Michael Geraghty

Date: 9/28/2021

2564055 1/54760

IN THE COURT OF COMMON PLEAS OF CHESTER COUNTY, PENNSYLVANIA

CIVIL ACTION

MICHAEL GERAGHTY                         : No. 2021-05552-CT
500 West Rosedale Avenue                 :
Apt. CLB10                               :
West Chester, PA 19382                   :
              *Plaintiff*                :
                                         :
        v.                               :
                                         :
EAST BRADFORD TOWNSHIP,                  :
CHESTER COUNTY                           :
666 Copeland School Road                 :
West Chester, PA 19380                   :
        and                              :
MANDIE CANTLIN, Individually and on behalf :
of EAST BRADFORD TOWNSHIP                 :
c/o 666 Copeland School Road             :
West Chester, PA 19380                   :
        and                              :
JOHN CARROLL                             :
1136 West Chester Road                   :
S. Coatesville, PA 19320                 :

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania:  Case Records of the Appellant and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

                              CURTIN & HEEFNER LLP


                        By:_____
                              Robert D. Sokolove, Esquire
                              Attorney for Plaintiff,
                              Michael Geraghty