IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL GERAGHTY** | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| **EAST BRADFORD TOWNSHIP,** | : | |
| **MANDIE CAWLEY CANTLIN and** | : | |
| **JOHN CARROLL** | : | NO. 21-4733 |

## MEMORANDUM OPINION

**Savage, J.**                                                                                                                     **February 10, 2022**

      This constructive discharge and First Amendment retaliation case arises from plaintiff Michael Geraghty's testifying in a personal injury lawsuit against his employer, East Bradford Township. He claims his supervisor had threatened and instructed him to lie about the Township's prior knowledge of the dangerous roadside conditions that caused the injury. After testifying, he was so harassed by his supervisor that he needed psychological treatment and quit.

      Geraghty brings claims under § 1983 against the Township and his supervisors, defendants Mandie Cawley Cantlin and John Carroll, for retaliating against him for exercising his First Amendment right to free speech. He also claims the Township violated Pennsylvania public policy by constructively discharging him. Moving to dismiss the First Amendment and constructive discharge claims, the defendants argue that because Geraghty's testimony took place in the course of his employment, he has no First Amendment right, and that its conduct was insufficient to violate state public policy or law.

      We hold that because Geraghty's testifying was not within his normal duties as an employee in the Department of Public Works and addressed matters of public concern, it

is protected speech under the First Amendment. He has alleged sufficient facts showing that his constructive discharge and the retaliatory actions against him violated his First Amendment right. They also violated Pennsylvania public policy.

### Background[1]

As alleged in his complaint, Geraghty worked for East Bradford Township in the Department of Public Works.[2] His duties included maintaining public roadways, including inspecting for and removing decaying and dangerous trees along the roads.[3] His supervisor was John Carroll, the Director of Public Works, who in turn reported to Mandie Cantlin, the Township Manager.[4]

Sometime in May 2016, Geraghty was working with a road crew removing a fallen tree limb.[5] At the scene was Melanie Harlan, the owner of Harlan Tree Services and Geraghty's live-in girlfriend whose business provided "on-call tree services" for the Township.[6]

Harlan informed Geraghty and Carroll that there were decayed trees down the road that were in danger of falling onto the roadway.[7] Carroll instructed Harlan not to remove them.[8] Geraghty asserts that Carroll's instructions were consistent with a Township

---

[1] The facts in Geraghty's complaint are as follows. As we must at this stage, we accept them as true and draw all reasonable inferences from them in his favor.

[2] Compl. at ¶ 5 (ECF No. 1-3) (attached as Ex. A to Notice of Removal (ECF No. 1)) (Complaint).

[3] *Id.* at ¶¶ 5-6.

[4] *Id.* at ¶¶ 3-4, 7-9.

[5] *Id.* at ¶ 12.

[6] *Id.* at ¶¶ 13, 19.

[7] *Id.* at ¶ 15.

[8] *Id.* at ¶¶ 16–17.

policy, approved by Cantlin, to "explicitly ignore dangerous conditions involving decaying or dead trees unless and until those trees actually fell onto a public right-of-way."[9]

On Christmas Day 2016, the tree limbs Harlan had identified in May fell and crashed on top of Eric Blevins' truck, causing him serious injuries.[10] Blevins filed a personal injury lawsuit against the Township. The Township defended the lawsuit, contending it had no prior notice of the dangerous condition.[11]

After learning about the Blevins incident, Carroll told Township officials and investigators that the Township had "no notice" of the decayed tree limbs that had fallen and injured Blevins.[12] He explicitly denied ever discussing the need to remove the limbs with Geraghty or Harlan.[13]

Carroll began "pressuring, abusing, inappropriately coaxing, and generally demanding" that Geraghty "know nothing" about their conversation with Harlan in May 2016.[14] Carroll would "inquire in an aggressive manner" about "the nature of the discussions [Geraghty] was having with Harlan regarding the incident" and would try to "coerce [Geraghty] into 'forgetting' what was actually said and had occurred."[15] Carroll called him late in the evening coaxing him to "shape his testimony" so it would be consistent with his.[16]

---

[9] *Id*. at ¶¶ 10–11.
[10] *Id*. at ¶¶ 18–19.
[11] *Id.* at ¶ 22.
[12] *Id*. at ¶ 21.
[13] *Id*. at ¶ 21, 24.
[14] *Id*. at ¶ 26.
[15] *Id*. at ¶ 28.
[16] *Id*. at ¶ 30.

At his deposition, Geraghty claims he testified truthfully.[17] After the deposition, Geraghty went to Cantlin's office and "begged her not to share the contents" of his testimony with Carroll.[18] She ignored his request.[19]

In the weeks after Geraghty testified, Carroll continued to verbally abuse and admonish him.[20] Geraghty claims that his "standing and job advancement were diminished as a result" of testifying and that Carroll's harassment caused him so much stress that he began to seek "emotional and psychological counseling."[21] Ultimately, the stress led Geraghty to quit his job.[22]

## Standard of Review

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly,* 550 U.S. at 556).

A conclusory recitation of the elements of a cause of action is not sufficient. *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). The plaintiff must allege facts necessary to make out each element. *Id.* (quoting *Twombly*, 550 U.S. at 563 n.8). In other

---

[17] *Id*. at ¶ 29.
[18] *Id*. at ¶ 32.
[19] *Id*. at ¶ 33.
[20] *Id*. at ¶ 38.
[21] *Id*. at ¶¶ 38–39.
[22] *Id*. at ¶ 40.

words, the complaint must contain facts which support a conclusion that a cause of action can be established.

In considering a motion to dismiss under Rule 12(b)(6), we first separate the factual and legal elements of a claim, accepting the well-pleaded facts as true and disregarding legal conclusions. Then, we determine whether the alleged facts make out a plausible claim for relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). All well-pleaded allegations in the complaint must be accepted as true and interpreted in the light most favorable to the plaintiff, and all inferences must be drawn in the plaintiff's favor. *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009).

## Analysis[23]

In Count Three, Geraghty claims that Carroll and Cantlin violated his First Amendment right when they retaliated against him for testifying in the Blevins case. In Count Four, he asserts that the Township retaliated against him for violating its pattern and policy of ignoring potential hazards. He argues that the Township retaliated against him because he testified truthfully in the Blevins matter in violation of this policy.

*First Amendment Retaliation*

To state a First Amendment retaliation claim, a plaintiff must establish that: (1) his speech was constitutionally protected, (2) the defendant took retaliatory action that was sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) there was a causal link between the constitutionally protected conduct and the

---

[23] Geraghty has withdrawn his claim for constructive termination against Carroll and his claim for hostile work environment against all defendants. *See* Pl.'s Mem. in Opp'n to Mot. to Dismiss of Def. John Carroll at 3–4 (ECF No. 17); Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss of Defs. Maddie Cantlin and East Bradford Township at 7 (ECF No. 20).

retaliatory action.  *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Palardy v. Township of Millburn*, 906 F.3d 76, 80–81 (3d Cir. 2018)).

The threshold question is whether Geraghty's testifying in response to a subpoena about matters related to his employment was "constitutionally protected conduct."  *Id.* (quoting *Palardy,* 906 F.3d at 80).  The answer to this question depends on whether he was speaking as a public employee or as a private citizen on a matter of public concern.

The Supreme Court has held that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes.  That is so even when the testimony relates to his public employment or concerns information learned during that employment." *Lane v. Franks*, 573 U.S. 228, 238 (2014).

The obligation to speak the truth "renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee."  *Id.* at 239.  "[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id*. at 240. Geraghty was a municipal maintenance worker.  Testifying at the deposition was not part of his ordinary job duties.  It was as a citizen who had an obligation to respond to a subpoena and speak the truth.

Having established Geraghty's speech was made as a citizen and not as an employee, we must now determine whether the speech addressed a matter of public concern.  To do so, we examine his statements to determine whether they address a matter of concern to the community, not of personal concern.  *Miller v. Clinton County*, 544 F.3d 542, 548 (3d Cir. 2008) (citing *Connick v. Myers,* 461 U.S. 138, 146–48 (1983)).

Geraghty's deposition testimony was a matter of public concern. It addressed facts bearing on the Township's responsibility to its citizens and, in particular, Blevins. Geraghty's speech did not address personal interests or grievances, but a matter of public concern. Thus, contrary to the defendants' contention, it was protected speech.

The defendants do not argue that Carroll's threatening, harassing, and intimidating Geraghty, as alleged, was not sufficiently retaliatory to deter a person of ordinary firmness from testifying. Nor could they. With respect to Cantlin's conduct, Geraghty alleged he complained to her about Carroll's behavior on multiple occasions and she did nothing. Put differently, he claims she acquiesced to Carroll's abuse. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (explaining that acquiescence is sufficient to establish liability under § 1983). At this stage, Geraghty has sufficiently alleged that Cantlin knew about Carroll's abuse and permitted it to continue. Thus, Geraghty has stated a First Amendment retaliation claim against Carroll and Cantlin.

*Official Capacity Claims*

Geraghty sued Carroll and Cantlin in both their individual and official capacities. State officials acting in their official capacity are not subject to liability under § 1983. They assume the identity of the employing agency. *Hafer v. Melo*, 502 U.S. 21, 22–23, 26–27 (1991) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). A claim for damages against state officials in their official capacity is the same as a claim against the employing entity. *Hafer*, 502 U.S. at 25 (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)). Because the real party in interest in an official-capacity suit is the government agency, actions against state officials in their official capacity are treated as suits against the agency. *Hafer*, 502 U.S. at 25 (citing *Graham*, 473 U.S. at 166); *see also Will*, 491

U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (citations omitted)).

When a plaintiff sues the state entity that employs the individual defendants, the claims against the individuals in their official capacities may be dismissed as duplicative of the claims against the state.  See *Hafer*, 502 U.S. at 25 (claims against individual defendants in their official capacities are equivalent to claims against the governmental entity itself, they are redundant and may be dismissed); *Snell v. City of York,* 564 F.3d 659, 664 (3d Cir. 2009) (quoting *Kentucky*, 473 U.S. at 165).  Hence, we shall dismiss the § 1983 claims against Carroll and Cantlin in their official capacities.

### Monell Claim

Government agencies and departments are not "persons" under § 1983 and can only be held liable when the plaintiff demonstrates "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  The necessary causal link is shown where the municipal agency promulgates a policy statement and the injurious act occurs as a result of the implementation of that policy; the policymaker himself violates federal law; or the policymaker is deliberately indifferent to the need for action to correct an inadequate practice that is likely to result in a constitutional violation and fails to act.  *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 249–50 (3d Cir. 2007).

A county agency may be held liable under § 1983 for injuries inflicted by its agents or employees only if the injuries were the result of a governmental policy or custom.  *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978); *Santiago v.*

*Warminster Township.,* 629 F.3d 121, 135 (3d Cir. 2010).  A governmental policy or custom can be established by showing either that the decisionmaker possessing final authority to establish a municipal policy did so by issuing an official statement of policy or that a governmental custom developed when the official acquiesced to a course of conduct such that it operated as law.  *Jiminez,* 503 F.3d at 250 (citations omitted).  An "official policy" is created not only by formal rules but also when the "government's authorized decisionmakers" make the "decision to adopt [a] particular course of action." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).  A "custom" exists when a "widespread practice" is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal citations omitted).

Geraghty alleges that the Township had a policy and practice of instructing its employees to "ignore dangerous conditions."[24]  But, he has not alleged facts showing that the Township had a policy and practice of retaliating against employees for speaking out about them.  He alleges that on numerous occasions Carroll told him and "others working in the Public Works Department[] to 'put blinders on' with respect to dangerous trees" they saw while driving around the Township.[25]  That does not make out a practice or policy of retaliation for violating the policy.  Therefore, we shall dismiss the § 1983 claim against the Township.

---

[24] Compl. at ¶ 10.
[25] *Id*. at ¶ 35.

*Pennsylvania Public Policy*

Pennsylvania is an "at-will" employment jurisdiction. "[A]bsent a statutory or contractual provision to the contrary, either party may terminate an employment relationship for any reason or no reason." *Weaver v. Harpster,* 975 A.2d 555, 562 (Pa. 2009) (citations omitted). There is no common law cause of action for wrongful discharge of an at-will employee. *Id.* But, an employer may not discharge an employee when termination would violate a clear public policy mandate. *Id.* at 562–63 (citing *Geary v. S. Steel Corp.*, 319 A.2d 174, 179–80 (Pa. 1971)).

Courts have found an exception where the employer has violated a legislative mandate. An employer cannot discharge an at-will employee for refusing to commit a crime, for complying with a statutorily imposed duty, or when it is prohibited from doing so by statute. *Mikhail v. Pa. Org. for Women in Early Recovery*, 63 A.3d 313, 317 (Pa. Super. Ct. 2013) (quoting *Donahue v. Fed. Exp. Corp.,* 753 A.2d 238, 244 (Pa. Super. Ct. 2000)). Exceptions include employees who were terminated after filing a claim for workers' compensation benefits, serving jury duty, and complying with a statutory duty to report violations. *Id*. (citations omitted). In the absence of such a legislative mandate, courts may identify a public policy of the Commonwealth "only when a given policy is so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it." *Weaver,* 975 A.2d at 563 (quoting *Mamlin v. Genoe,* 17 A.2d 407, 409 (Pa. 1941)).

Geraghty claims that constructively terminating an employee for testifying at a deposition violates Pennsylvania public policy. He relies on *Reuther v. Fowler & Williams, Inc.,* 386 A.2d 119, 120–21 (Pa. Super. Ct. 1978), which held that discharge for compliance with a subpoena for jury service was actionable, and *Heidorn v. Church,* No.

1590 EDA 2015, 2016 WL 4651382, at *2 (Pa. Commw. Ct. 2016), where the plaintiff was fired within days of testifying against her terminated supervisor in a court proceeding.

In *Heidorn,* the plaintiff alleged she was fired "because [her employer's] leaders did not approve of her testimony at the court proceeding the previous week." *Id.* at *1 (quoting trial court opinion). The Commonwealth Court held that "[i]f the [defendant] did terminate [plaintiff's] employment because it did not agree with her testimony, public policy was not violated." *Id.* at *3.

Not only is the *Heidorn* opinion non-precedential,[26] it is distinguishable from this case. The court emphasized that the plaintiff voluntarily testified and was not compelled to testify. It distinguished Ms. Heidorn's predicament from that of a juror whose termination violated public policy because she could have been penalized for ignoring a jury summons. *See id.* at *3 n.2 ("We note that terminating an employee for complying with a *subpoena* could violate public policy. . . [h]owever, that scenario is not present in the instant case.") The court pointed out that the plaintiff had "not averred she was wrongfully terminated for obeying a lawfully issued subpoena, but that she was discharged because she 'testified honestly under oath.'" *Id.* at *3. The court reiterated that the plaintiff testified voluntarily and that the truth of her testimony was immaterial. *Id.* at *3.

Geraghty did not testify voluntarily. He was subpoenaed.[27] Of course, he had an obligation to testify at his deposition and to do so truthfully. Firing an employee for

---

[26] *See* Pa. R. App. P. 126(b)(1)-(2) (defining a "'non-precedential decision' [as] an unpublished non-precedential memorandum decision of the Superior Court filed after May 1, 2019 or an unreported memorandum opinion of the Commonwealth Court filed after January 15, 2008. [Stating that such n]on-precedential decisions. . . may be cited for their persuasive value.")

[27] Under Pennsylvania law, a witness who fails to comply with a subpoena risks sanctions, including being held in contempt. *Township of Bristol v. 1 Enterprise, LLC,* 177 A.3d 1045 (Pa. Commw. Ct. 2018)

testifying truthfully is so obviously against the public morals or welfare that "there is a virtual unanimity of opinion" that it violates public policy.  *See Weaver*, 975 A.2d at 563 (citations omitted).

Prior to his testimony, Geraghty alleges Carroll pressured him to lie.  When he did not and instead testified truthfully, Carroll engaged in a course of retaliatory conduct that led to his constructive termination.  If Geraghty had not testified truthfully to avoid retaliation, he would have committed perjury.  An employer may not, as a matter of public policy, fire an employee for refusing to commit a crime.  *Mikhail,* 63 A.3d. at 317 (citations omitted).

Geraghty has alleged that "he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign." *Kegerise v. Delgrande,* 183 A.3d 997, 1003 (Pa. 2018) (quoting *Green v. Brennan,* 578 U.S. 547, 555 (2016)).  We find that Geraghty has, at least at this stage, alleged enough to show that Carroll and Cantlin's conduct on behalf of the Township caused him to quit.  Thus, Geraghty has stated a claim for constructive discharge.

*Intentional Infliction of Emotional Distress*

To state a claim for intentional infliction of emotional distress, Geraghty must allege that (1) Carroll's conduct was extreme and outrageous; (2) it was intentional or reckless; (3) it caused him emotional distress; and (4) the distress was severe. *Hoy v. Angelone,* 691 A.2d 476, 482 (Pa. Super. Ct. 1997) (citations omitted).

---

("If a party fails to comply with a valid notice to attend or notice to produce, the court may impose sanctions" (citing Pa. R. Civ. P. 234.5(a))).

Extreme and outrageous conduct is "beyond all possible bounds of decency," "atrocious," and "utterly intolerable in a civilized community." *Salerno v. Phila. Newspapers, Inc.,* 546 A.2d 1168, 1172 (Pa. Super. Ct. 1988) (citations omitted) (citing Restatement (Second) of Torts § 46, cmt. d (1965)). Under Pennsylvania law, extreme and outrageous conduct is found "in only very egregious cases," such as concealing a child's death or withholding the body from the parents, mishandling a corpse, or recklessly diagnosing a fatal disease. *See Hoy,* 691 A.2d at 482–83 (collecting examples); *see also Salerno*, 546 A.2d at 1172 (collecting examples). As alleged, Carroll's rudeness and unprofessional conduct was objectionable and distasteful, but it was not extreme or outrageous enough to sustain a claim for intentional infliction of emotional distress.

The complaint makes bald, conclusory statements that Carroll's "activities were incredibly inappropriate, outrageous, [and] dangerous."[28] What Geraghty contends were outrageous are pitting him against his girlfriend, "after hour[s] threatening phone calls," "constant badgering," and "a multitude of other activities" and "other forms of intentional retaliation."[29] These conclusory statements fall short of alleging sufficient facts to suggest a claim that Carroll's conduct was extreme or outrageous.

## Conclusion

We hold that terminating an employee for testifying truthfully in response to a subpoena is actionable as a public policy exception to the at-will doctrine. Geraghty has stated a claim against the Township and Cantlin for constructive discharge. He has also stated claims of First Amendment retaliation against Carroll and Cantlin in their individual

---

[28] Compl. at ¶ 86.

[29] *Id*. at ¶¶ 81–85.

capacities. He has failed to state a claim for intentional infliction of emotional distress against Carroll. Therefore, we shall grant the defendants' motions to dismiss in part and deny them in part.